Sam TEAGUE and/or Sam Teague Ford, Inc., Plaintiffs-Appellees,

v.

TENNESSEE FARMERS MUTUAL INSURANCE COMPANY, Defendant-Appellant.

Court of Appeals of Tennessee, Western Section.

Sept. 18, 1979.

Certiorari Denied by Supreme Court Oct. 22, 1979.

W. W. Lackey, Lackey & Lackey, Savannah, for defendant-appellant.

James A. Hopper, Ross & Hopper, Savannah, for plaintiffs-appellees.

MATHERNE, Judge.

The plaintiffs sue the defendant insurance carrier to recover collision damage to a 19-foot Cobalt inboard-outboard pleasure motorboat owned by the plaintiff corporation and insured in the name of the individual plaintiff, Sam Teague, who owns 100% of the common stock of the plaintiff corporation. The chancellor held for the plaintiffs and entered judgment against the defendant insurer. The insurer appeals insisting that the chancellor erred in: (1) holding that the insurer was estopped to deny liability under the policy; (2) failing to find that the policy was void because Sam Teague represented himself as the owner of the boat whereas in fact the boat was owned by the corporation and used for business purposes; (3) permitting the plaintiff to amend the complaint to show "Sam Teague and/or Sam Teague Ford, Inc." as plaintiffs; and (4) finding that the amount of damage was $6,561.20 instead of $2,307.95.

The boat was kept at Pickwick Lake and it was used by the employees of Sam Teague, Inc., their families and friends. About two months after the boat was purchased, the sales manager of Sam Teague, Inc., his family and friends were using the boat when, during darkness, it was driven into and against a pier. The collision caused considerable damage to the pier, threw all occupants of the boat into the water and damaged the boat. The claims for personal injury sustained by the passengers were settled under the policy provisions as was the damage to the pier. The parties could not agree on the amount necessary to repair the boat and this lawsuit was originally brought by Sam Teague Ford, Inc., seeking judgment for damages to the boat.

The insurer moved to dismiss because it had not issued a policy to Sam Teague Ford, Inc. The plaintiff thereupon amended the complaint to name Sam Teague as the plaintiff. During the trial it developed that the owner of the boat was Sam Teague Ford, Inc. The insurer then moved for permission to amend its answer to deny liability because the fact of ownership had been misrepresented to it and the fact that the boat was owned by the corporate plaintiff and used in its business increased the risk of loss. The plaintiffs then amended the complaint to name as plaintiffs "Sam Teague and/or Sam Teague, Inc." The chancellor held that the lawsuit was brought by "Sam Teague and Sam Teague Ford, Inc.," and he gave judgment for the "plaintiffs."

■ It is established in Tennessee that the owner of 100% of the common stock of a corporation has an insurable interest in specific items of property owned by the corporation. *American Indemnity Co. v. Southern Missionary College* (1953) 195 Tenn. 513, 260 S.W.2d 269. See also 4 Appleman, Insurance Law and Practice, § 2456 (1969); 43 Am.Jur.2d *Insurance* § 496 (1969). We therefore hold that when the original complaint was amended to name Sam Teague, the named insured, as the plaintiff, the lawsuit was properly before the chancellor. The naming of "Sam Teague and/or Sam Teague Ford, Inc.," as plaintiff was surplusage but not fatal to the cause of action. Any judgment rendered would be in favor of Sam Teague.

An issue to be determined in this lawsuit is whether Sam Teague misrepresented the true ownership of the boat and the purpose for which it would be used. We can readily understand that the risk of loss assumed on a boat owned by a corporation for the purpose of use by its employees and their families and friends could be much greater than the risk of loss assumed on a boat owned by an individual and used by the owner and those to whom he gives permission. It is notable that the defendant insurer does not insure corporate property.

Sam Teague testified that he advised the insurer's agent that the boat was owned by Sam Teague Ford, Inc., and that it would be used for the purposes of that corporation. He stated that he was unaware until after the accident that the policy named Sam Teague as the named insured. We must hold that this evidence is countermanded by the statements in the application for the policy signed by Sam Teague. The application shows Sam Teague as the named insured. On the other hand the application does not require an answer as to who owns the property insured. If the insurer does not insure corporate property, it would appear that the application for insurance should be so designed as to require a statement of ownership. The face of the application shows Sam Teague as the named insured which, under the authorities cited, is permissible because he owned 100% of the corporation which owned the boat.

The insurer's agent testified that Sam Teague did not tell him that the boat was owned by the corporation. It must be here noted that the agent did not testify that Sam Teague gave a false statement as to the ownership of the boat, and as heretofore noted the application did not ask that question. The agent's secretary testified that after the collision Sam Teague called her by telephone and asked that the named insured be changed from Sam Teague to Sam Teague Ford, Inc. Sam Teague denied

that statement. The premium on the policy was paid by a check drawn on Sam Teague Ford, Inc.

■■ The chancellor found that the insurer was estopped to deny coverage. Looking to the cases cited by the chancellor in his memorandum opinion, we conclude that the chancellor found that the agent was negligent in taking the application and that the plaintiff was misled to his detriment by the issuance of the policy. We do not think the controversy is controlled by the doctrine of estoppel. It appears to this Court that the evidence preponderates in favor of the plaintiff on the issue of whether the plaintiff misrepresented the true ownership of the boat. Under the record, Sam Teague made no representation that he owned the boat; he was not asked the question. The plaintiff had an insurable interest in the boat, and if corporate ownership would bar the issuance of the policy, the onus was on the insurer to inquire about the ownership of the boat. We, therefore, hold Sam Teague, the named insured, is entitled to recover under the policy.

The issue of damages was hotly contested in an argumentative sort of way. On the amount of damages recoverable the policy provides that:

In the event of damage to plastic, glass fiber, plywood or other laminated portions of the insured boat, arising as a result of perils insured against, this Company shall not be liable for more than the cost of making repairs in accordance with customary or generally accepted shipyard repair practices on damaged plastic, glass fiber, plywood or other laminated construction, or at the option of this Company, liability shall be limited to an amount not exceeding the cost of making repairs in accordance with any specific or recommended repair specifications of the manufacturers of the insured boat.

The boat was manufactured by Fiberglass Engineering, better known as Cobalt Boats of Neodesha, Kansas. It is of fiberglass construction and is powered by a 185 horsepower inboard-outboard engine. Teague purchased the boat new for about $9,000. The boat was under a two year warranty which by its terms did not cover a boat which had been involved in an accident. The policy allowed $10,000 coverage on the boat.

Alex Barry, customer service manager for the manufacturer, testified by deposition which was read into the record. He stated that the boat consists of two main parts: the hull assembly and the deck assembly which in the manufacturing process are molded separately and then put together. Thereafter, other items such as seat cushioning, hardware and an engine are put on the boat. On the issue of how the boat should be repaired, Barry testified as follows:

Q. All right, Mr. Barry, would you have an opinion how this boat can be repaired?

A. Yes, I do.

Q. What is that?

A. By replacing the hull and the deck assemblies, the damaged part of the hardware and there were a few small parts.

Q. So you say replace the hull and the deck?

A. Yes.

Q. How would you go about this?

A. By returning it to our facility in Neodesha, Kansas, and manufacturing a new hull and a new deck, taking all of the good parts from this particular boat and installing them in the new parts.

Q. Why would you recommend doing this procedure?

A. In my opinion, this boat has enough severe damage visible and the possibility of enough not visible structural damage that it probably could not be repaired properly.

Q. Have you had occasion to estimate what this procedure would cost, as far as Mr. Teague?

A. Yes, I have.

Q. Have you prepared an itemized list, sir?

A. Yes.

Q. Do you have it with you there?

A. Yes, I do.

Q. Will you explain this to the Court?

A. I have listed to replace a hull assembly—do you want me to list the prices?

MR. HOPPER: Well, just to save time Bill, can't we file this—let it be filed as Exhibit 12.

(Exhibit 12 marked and filed)

Q. Basically, what are the items that you would repair at your company?

A. We would be replacing the hull assembly, the deck assembly, both port and starboard bow rails and their stanchions which are hardware that supports them, a rear teakwood rail on the back of the boat, the propeller and miscellaneous small parts, which I have as an anchor light bracket, a swim platform bracket and three items of upholstery, all being in the bow area.

Q. Looking at exhibit 12 it appears at the main item is as you say the hull and deck assembly?

A. That is correct.

Q. And that comes to total parts of $5,061.20 as I read it, is that right?

A. That is correct.

Q. Total labor of $1,000.00?

A. That is correct.

Q. Freight is $500.00, based on 1250 miles at forty cents a mile?

A. That is correct.

Q. A total of $6,561.20?

A. Yes sir.

Q. Mr. Barry, do you know of any other way that this boat could be repaired that it could be not only cosmetically sound, or hold its cosmetic effect, as well as structural stability?

A. No sir.

Q. Could the hull and deck assembly be, as we laymen say, patched, without going through all this procedure?

A. You mean the procedure of replacing these parts?

Q. Yes?

A. I would have to say that any fiber glass product can be repaired—whether or not it can be repaired properly is the question I believe.

Q. Well, answer this, sir, why would you rebuild the hull and deck as opposed to patching it?

A. You mean replace it rather than patch it?

Q. Right?

A. One of the considerations of course would be economics, the other would be from esthetics—if I can clarify those as best as possible, there would be a tremendous amount of labor involved just figuring out how much structural damage has occurred to this boat—the information I have right now, there is no way to tell how much structural damage is done internally to the hull—just to determine that, the whole boat literally has to be disassembled, much further than if we just replaced the hull, so by replacing it, there is a tremendous labor savings there, and the two offset each other—the other thing as I mentioned is from a cosmetic standpoint, that it is very difficult to refinish fiber glass properly by using gel and having a long lasting finish that will not give further problems in the future—I think perhaps to answer your question best, it is not possible to repair this type of damage and have any kind of assurance that you are not going to have recurring structural problems in the future.

He further testified that the repairs he recommended would be in accordance with accepted shipyard repair practices and the warranty would extend for two years after the repairs were made.

There are certain aspects of Mr. Barry's testimony that cause some concern to this Court. He stated that his department, customer service, involved the handling of all warranty problems with the dealers, parts

and part distribution and the operation of a service facility. He stated that the service facility consisted of a small shop with four employees who did both warranty and non-warranty repair. He did not state that these employees repaired wrecked boats, nor did he state that he had experience in the actual repair of wrecked fiberglass boats. His position is the safe one—replace all damaged parts—which under the facts has the practical result of manufacturing a new boat. He stated:

> In my opinion, this boat has enough severe damage visible and the *possibility* of enough not visible structural damage that it *probably* could not be repaired properly. (Emphasis added)

> \* \* \* \* \* \*

> I think perhaps to answer your question best, it is not possible to repair this type damage and have any kind of assurance that you are not going to have recurring structural problems in the future.

Mr. Barry's responsibility to his company was to take care of warranty problems with the dealers. He does not show any experience with Cobalt Boats as an appraiser of collision damage to fiberglass boats. It is one thing to be able to examine a boat and decide if it is in proper condition under the terms of a manufacturer's warranty while it is quite another matter to inspect a fiberglass boat which has been damaged in a collision and say whether the damage can be repaired. To qualify on the latter, some experience in making such repairs should be shown.

Mr. Teague testified that he thought the boat required the treatment suggested by Mr. Barry. He stated that "a main consideration" for that conclusion was the fact that he would thereby obtain a manufacturer's warranty for two years after the work was done. Mr. Lilly, the dealer from whom the boat was purchased, stated that he advised Mr. Teague to have the *manufacturer* repair the boat. Mr. Lilly has a shop for the repair of fiberglass boats but he did not make an estimate of the cost to repair this boat because he had never before repaired a boat with such extensive damage.

The defendant presented Charles Taylor, the owner and operator of T & K Boat Repair of Madison, Tennessee, and Taylor's employee, Herman Culbreath. T & K Boat Repair of Madison is a business engaged in the repair of fiberglass products. Mr. Taylor has been in this fiberglass repair business for about 15 years. He was with Glaspar Boat Company in the repair of boats and later in management. He opened his own business in 1969 and is now actively engaged in the repair of fiberglass products including fiberglass boats of various makes. The employee, Culbreath, inspected the boat, made his notes and from his report he and Taylor made an estimate of the cost to repair the *fiberglass*. The estimate includes the replacement and refinishing of the damaged fiberglass of the hull and the deck. It also includes what is referred to as "handrails" which were to be replaced. The total cost for the material and labor was $2,107.95, plus $200 for transportation or a total of $2,307.95. These witnesses testified that the boat could be repaired and when repaired it would be in as good condition as prior to the collision. Taylor also testified that the repairs would be in accordance with customarily or generally accepted shipyard repair practices. Taylor testified that he had successfully repaired fiberglass boats with *more* extensive damage than that sustained by the boat in question. Taylor inspected the boat on a later date and said that he saw nothing that would change his opinion as to whether the boat could be repaired or the cost of the repair as stated in the estimate.

Taylor and his employee did not closely examine and ask questions about certain rails, cushions, the propeller, etc., which according to Barry were damaged. This was due to the fact that Taylor was looking to the cost of repairing the fiberglass and any of the hardware or dressing that the owner wanted repaired would be done, but at the owner's cost. Taylor does not stock any of these parts for any make of fiberglass boats. He obtains them from a dealer in the particular brand and installs them. The "handrails" referred to in Taylor's estimate

had some connection with the fiberglass to be repaired and was included for that reason.

■ We hold that the weight of the evidence establishes that this boat can be repaired as set out in the policy. It is not necessary to manufacture another boat as suggested by Mr. Barry. We will, therefore, adjust the amount of damages. The Taylor estimate included $180 for parts other than fiberglass repair. As we understand the record, those parts were included in Mr. Barry's list of the ten items other than fiberglass which he found were damaged. The cost of the ten items listed by Barry totals $385.60. The difference in the two figures is $205.60 to which the plaintiff is entitled. We, therefore, hold that the judgment of the trial court is modified so as to be in the amount of the Taylor estimate of $2,307.95 plus $205.60 for additional parts, or $2,513.55. The judgment as modified is affirmed. This cause is remanded to the trial court for the enforcement of its judgment as herein modified.

The plaintiff-appellee assigns the following errors: 1) the court erred in failing to award damages for the loss of use of the boat; and 2) the court erred in failing to assess the 25% statutory penalty as allowed by T.C.A. § 56–1105.

■ In support of its claim for damages due to the loss of use of the boat the plaintiffs cite *Perkins v. Brown* (1915) 132 Tenn. 294, 177 S.W. 1158 and *Anderson v. Innman* (1926) 3 Tenn.App. 195. Both of those lawsuits sounded in tort seeking damages resulting from the plaintiffs' cars being wrecked. We hold that the rule announced in those cases is not applicable to the present lawsuit which is brought to enforce a contract of insurance. The policy does not insure against loss of use of the boat. We affirm the chancellor in his refusal to award damages for loss of use of the boat.

■ The claim for the 25% statutory penalty is without merit and the chancellor is affirmed in this respect.

The costs in this Court and in the trial court are adjudged one-half against each party.

SUMMERS and EWELL, JJ., concur.